IN THE
UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| TROY EADS,<br>    Plaintiff,<br><br>v.<br><br>SHELLY HARDING,<br>    Defendant. | Case No. 2:23-cv-02266-JEH |

**Order**

Now before the Court is Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D) (Doc. 33) and Plaintiff's Motion for Summary Judgment (Doc. 46). For the reasons stated *infra*, Defendant's Motion is GRANTED, and Plaintiff's Motion is DENIED.

**I**

On February 7, 2024, Plaintiff filed an Amended Complaint under 42 U.S.C. § 1983 alleging that Defendant Shelly Harding, a nurse at the Vermilion County Jail ("VCJ"), violated his Fourteenth Amendment rights by providing constitutionally inadequate medical care for injuries he sustained in a car accident before he was detained at VCJ. (Docs. 8 and 11).

On January 3, 2025, Defendant filed a Motion for Summary Judgment. (Doc. 33). On January 27, 2025, Plaintiff filed a handwritten document titled "for summary judgment," which was docketed as a Response to Defendant's Motion for Summary Judgment. (Doc. 37). On February 20, 2025, Defendant filed a Reply. (Doc. 38).

On February 24, 2025, Plaintiff filed a Motion for Extension of Time requesting additional time to file a Response to Defendant's Motion for

Summary Judgment. (Doc. 39). Plaintiff stated he had been placed in the Healthcare Unit at Jacksonville Correctional Center and did not have access to the prison law library and his legal materials. *Id.* On March 14, 2025, the Court granted Plaintiff's Motion and directed him to file a Response to Defendant's Motion for Summary Judgment by April 21, 2025. (d/e 3/14/2025).

On April 17, 2025, Plaintiff filed a Motion to Deny Defendant's Motion for Summary Judgment asserting that Defendant never served him with a copy of her Motion for Summary Judgment. (Doc. 40). Instead, Plaintiff claimed that Defendant allegedly sent him copies of discovery requests for another case. *Id.* On April 21, 2025, the Court denied Plaintiff's Motion, directed Defendant to send Plaintiff a copy of her Motion for Summary Judgment and exhibits, and ordered Plaintiff to file his Response by June 4, 2025. (d/e 4/21/2025).

On May 1, 2025, Plaintiff filed a second Motion for Extension of Time requesting additional time to file his Response. (Doc. 41). On May 2, 2025, the Court granted Plaintiff's Motion and directed him to file his Response by August 4, 2025. (d/e 5/2/2025).

On July 14, 2025, Plaintiff filed a document titled "Summary Judgment," which was docketed as Plaintiff's Motion for Summary Judgment. (Doc. 46). On August 4, 2025, Defendant filed a Reply in Support of Her Motion for Summary Judgment arguing that Plaintiff's Motion for Summary Judgment should be stricken as untimely or denied. (Doc. 47).

## II

### A

Defendant's Motion includes a section listing the undisputed material facts in this case. (Doc. 33 at pp. 2-11). Under Local Rule 7.1(D)(2)(b), a party opposing a Motion for Summary Judgment must respond to the moving party's undisputed material facts and provide additional material facts, which must be supported by

admissible evidence. Plaintiff did not respond to Defendant's statement of material facts in his Response or include a statement of material facts in his Motion for Summary Judgment. (Docs. 37 and 46). Plaintiff's Response and Motion for Summary Judgment do not comply with Local Rule 7.1(D). *See* Civil LR 7.1(D)(1)-(2) (outlining the requirements for a motion for summary judgment and a response). A party's "failure to respond to any numbered fact will be deemed an admission of the fact." *Id.* at (D)(2)(b)(6). A district court does not abuse its discretion by strictly enforcing this rule, even against a *pro se* litigant. *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016); *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). Although Plaintiff's failure to respond to Defendant's undisputed material facts requires this Court to consider Defendant's factual assertions as admitted, summary judgment in favor of the movant is not automatic. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The burden remains with the Defendant to show that she is entitled to judgment as a matter of law. *Id.* The Court relies on the following supported facts and the Court's review of the record.

**B**

Plaintiff Troy Eads was a pretrial inmate detained at the VCJ from October 18, 2023 to March 1, 2024. Defendant Shelly Harding is the Director of Nursing at VCJ and a licensed registered nurse. Defendant Harding treated Plaintiff during his detention at VCJ.

Before his detention, Plaintiff was run over by a van on September 4, 2023. Plaintiff sustained a laceration to his right arm, lacerations to his back, face, and ear, fractures to his left knee and lumbar spine, and broken ribs. (Doc. 33-1 at pp. 18-21). Plaintiff was treated at Carle Hospital. According to his hospital records, Plaintiff sustained an avulsion tibial spine fracture to the left knee, right deltoid area laceration for which he underwent an irrigation and debridement procedure on September 7, 2023, and displaced left L3 and L4 transverse process fractures.

(Doc. 33-2 at ¶ 4, pp. 108-116, 127-130, 224-225). X-rays did not show an acute fracture or dislocation of his right shoulder, and no post-hospitalization orthopedic intervention was recommended for the right shoulder. *Id.* at pp. 125-126. The plan was to treat the left tibial spine fracture conservatively, use a knee immobilizer, and follow up with Dr. Adam Kahn as an outpatient for the left knee. (Doc. 33-1 at pp. 23-25; Doc. 33-2 at pp. 127-128). Plaintiff testified he was told there was nothing they could do for his back, and no one recommended physical therapy. (Doc. 33-1 at p. 32).

Plaintiff had a follow up appointment for his left knee with Dr. Kahn on September 20, 2023. According to an x-ray, the condition of his left knee was unchanged. Dr. Kahn advised Plaintiff that the injury could be treated nonoperatively if the fracture maintained its position. Dr. Kahn advised of the longer recovery time following surgery compared to letting the fracture heal and that Plaintiff's smoking history could lead to poor outcomes for fractures, especially if surgery was performed. Instead, Dr. Kahn provided Plaintiff with a knee brace and recommended a follow up appointment and x-rays to assess healing. Dr. Kahn did not treat Plaintiff's right deltoid laceration and recommended that Plaintiff follow up with general surgery about his shoulder. Dr. Kahn prescribed Naproxen, a pain medication, for ten days. (Doc. 33-1 at pp. 26-27, 34; Doc. 33-3 at pp. 247-260).

On October 3, 2023, Dr. Mohammed Elshamy removed the drains that had been placed in Plaintiff's shoulder during the irrigation and debridement procedure. Plaintiff denied any further needs regarding his shoulder. (Doc. 33-1 at pp. 24-25; Doc. 33-3 at pp. 263-264). Although Plaintiff testified that physical therapy was recommended for his shoulder, he testified that he got the "spin around" with the Carle staff when he asked about scheduling therapy and that he felt better after the drains were removed and the wound healed. (Doc. 33-1 at pp.

4

24-25, 27, 29-30). Plaintiff did not go to his follow up appointment with Dr. Kahn on October 4, 2023, because he did not have a ride. *Id.* at pp. 23-24. Plaintiff's shoulder laceration was healed by the time he was booked at the VCJ on October 18, 2023, and he had no active prescriptions. *Id.* at pp. 31-32, 35; Doc. 33-2 at p. 117; Doc. 33-3 at p. 258.

C

Two days after booking, Plaintiff saw Nurse Rush for an initial medical screening at VCJ on October 20, 2023. (Doc. 33-1 at pp. 39-40; Doc. 33-5 at ¶ 6). Plaintiff told Nurse Rush he had been struck by a van on September 4, 2023, and sustained a left knee injury. He wore a hinged knee brace. He also sustained a right shoulder laceration, which Nurse Rush examined, and saw was healed. Plaintiff told Nurse Rush he had a history of two lumbar fractures, but he did not specify when those occurred. Plaintiff denied taking any medications. (Doc. 33-1 at pp. 38-42; Doc. 33-4 at ¶ 8; Doc. 33-5 at ¶ 7). Plaintiff told Nurse Rush that surgery was scheduled for November 2, 2023, but he did not know the name of the provider. Nurse Rush contacted Carle Hospital and was told that Dr. Kahn saw Plaintiff on September 20, 2023; they discussed surgical and non-surgical options; Plaintiff wanted non-surgical treatment; and no surgery was scheduled on November 2, 2023, or any other date. (Doc. 33-4 at p. 2, ¶ 9; Doc. 33-5 at p. 2, ¶ 8). Plaintiff did not complain about his shoulder, back, or ribs at his medical screening. (Doc. 33-4 at ¶ 10; Doc. 33-5 at ¶ 9). Nurse Rush scheduled Plaintiff for an appointment with Dr. Kahn on November 13, 2023. (Doc. 33-4 at ¶ 11; Doc. 33-5 at ¶ 10).

On November 13, 2023, Defendant Harding spoke with Plaintiff because he submitted a medical request form complaining about his arm and low back and had prior complaints about his knee. Defendant gave him an extra blanket to elevate his foot and offered to prescribe him pain medication, but he refused medication. (Doc. 33-4 at ¶ 12). Plaintiff did not go to the scheduled appointment

with Dr. Kahn on November 13, 2023, because command staff at VCJ missed the appointment. His appointment with Dr. Kahn was rescheduled to November 27, 2023. (Doc. 33-4 at ¶ 13; Doc. 33-5 at ¶ 12). Because Plaintiff missed his appointment and submitted medical request forms, Defendant called for him to be seen in the medical clinic on November 15, 2023, but he refused to be seen. (Doc. 33-4 at ¶ 14).

On November 20, 2023, Defendant saw Plaintiff because he complained about pain in his left knee and requested pain medication. Defendant prescribed Naproxen 500 mg, twice a day for seven days. *Id.* at ¶ 15. Naproxen is a pain reliever that lasts up to twelve hours, longer than over-the-counter ibuprofen and acetaminophen. *Id.* at ¶ 20.

Plaintiff continued to submit medical request forms complaining about left knee pain and asked to see a doctor. *Id.* at ¶ 16. On November 22, 2023, Plaintiff stated that the Naproxen which Defendant prescribed him was making him feel sick. Nurse Rush advised him to save something from his food tray to eat with it. (Doc. 33-1 at pp. 52-53; Doc. 33-5 at ¶ 13). Plaintiff claimed that eating with the Naproxen did not work, but he continued to take Naproxen in the evening into January 2024.[1] *Id.* at ¶ 14; Doc. 33-2 at pp. 13-14, 22, 27.

On November 27, 2023, Plaintiff saw Dr. Kahn for an evaluation and discussed surgical and nonsurgical treatment options. Dr. Kahn recommended conservative management, and Plaintiff agreed. Although Plaintiff experienced some pain and instability during pivoting movements, he was healing and the fracture was stable. X-rays that day showed no significant change from previous films and the presence of some bridging bone, which demonstrates healing. After examining Plaintiff, Dr. Kahn recommended six weeks of physical therapy for his

---

[1] A circled date on the medical administration record and handwritten time reflects a refused Naproxen dose.

6

left knee. If Plaintiff continued to demonstrate improvement, conservative management would continue. Dr. Kahn instructed Plaintiff to wean off the brace. If Plaintiff continued to plateau and did not demonstrate improvement within twelve weeks, Dr. Kahn recommended another x-ray and possible surgical options. Dr. Kahn did not order any pain medications. (Doc. 33-4 at ¶ 17).

On November 29, 2023, Defendant responded to Plaintiff's request for the "meds [his] doctor gave [him]." Defendant advised Plaintiff that Dr. Kahn did not prescribe medications but that he still had a prescription for Naproxen. *Id.* at ¶ 18. Defendant was unaware of any issues Plaintiff had with Naproxen because he had been taking at least one dose a day since she prescribed it. *Id.* at ¶ 19.

On November 30, 2023, Defendant denied Plaintiff's request for an extra mattress because, in her opinion, it was not medically necessary and was not ordered by any physician. (Doc. 33-1 at p. 56; Doc. 33-4 at ¶ 21). On December 1, 2023, Defendant saw Plaintiff in the VCJ clinic and explained to him the lack of medical necessity of a second mattress. She also informed him he had appointments scheduled with a physical therapist and Dr. Kahn. *Id.* at ¶ 22. Defendant and Nurse Rush regularly provided Plaintiff with ice packs. *Id.* at ¶ 31.

**D**

Plaintiff had an appointment with Amber Paige, a physical therapist, on December 6, 2023. After evaluating Plaintiff, the physical therapist recommended that Plaintiff do home therapy for his left knee, in his cell, twice a day. The therapist instructed Plaintiff how to perform the home therapy and recommended an ice pack for left knee pain. (Doc. 33-1 at pp. 79-80; Doc. 33-4 at ¶ 23). Plaintiff testified he did the exercises in his cell on his own. (Doc. 33-1 at pp. 57-58, 79-82).

On January 8, 2024, Plaintiff submitted a request form stating that Naproxen did not provide adequate pain relief. Nurse Rush saw Plaintiff on the January 10, 2024. Plaintiff complained about his right shoulder, which he claimed never

7

healed. Nurse Rush asked him who treated his right shoulder. Nurse Rush told him that Dr. Kahn never ordered any medication. She asked Plaintiff to sign the VCJ's waiver/release of long-term use of NSAIDs, which includes Tylenol and Naproxen. Plaintiff refused to sign the form, and his prescription for Naproxen was discontinued. Plaintiff was referred to an advanced care provider, Nurse Practitioner Steve Skimehorn, to discuss pain management. (Doc. 33-5 at ¶ 15). On January 12, 2024, Plaintiff was called to the VCJ clinic for his appointment with Nurse Practitioner Skimehorn, but Plaintiff refused to be seen. (Doc. 33-1 at pp. 90-92; Doc. 33-4 at ¶ 25).

On January 15, 2024, Plaintiff returned to physical therapist Amber Paige for a follow up appointment for his left knee, which was the first available appointment for a subsequent evaluation. Plaintiff informed the physical therapist that he had not worn his knee brace since a week after starting physical therapy. The physical therapist noted that Plaintiff was improving steadily and provided additional home exercises. (Doc. 33-1 at pp. 77-82; Doc. 33-4 at ¶ 26).

Plaintiff saw Dr. Kahn the same day and complained of pain. Dr. Kahn explained that continuing physical therapy and a steroid injection might provide relief. If the pain persisted, an MRI would be considered. Dr. Kahn explained that surgery would require a period of immobilization and might take an entire year to recover. Plaintiff chose to proceed with an injection. Dr. Kahn administered an injection to the left knee, prescribed Tylenol extra strength, and ordered a follow up appointment in two months. (Doc. 33-1 at pp. 47-48; Doc. 33-4 at ¶ 27). Tylenol extra strength was provided to Plaintiff as prescribed by Dr. Kahn. *Id.* at ¶ 28.

E

Around January 12, 2024, Plaintiff began complaining about his arm and back. Defendant called Carle staff on January 17, 2024, to inquire who Plaintiff should see about his shoulder. She was informed that he was in the emergency

8

room on September 4, 2023, had surgery on September 7, 2023, and he was supposed to follow up with general surgery following his release from the hospital but never did. Dr. Kahn's nurse was going to ask Dr. Kahn if Plaintiff could see him for the shoulder. Carle staff could not find that he was treated for anything related to his spine. *Id.* at ¶ 29. Dr. Kahn agreed to see Plaintiff about his right shoulder at the next available appointment on March 4, 2024. *Id.* at ¶ 30.

On January 17, 2024, Plaintiff was called to the VCJ clinic for an evaluation of his shoulder and knee, but he refused to be seen. (Doc. 33-1 at pp. 90-92; Doc. 33-5 at ¶ 16).

On March 1, 2024, Plaintiff left VCJ after being convicted and sentenced. (Doc. 33-4 at ¶ 32). Because Plaintiff was released to the custody of the Illinois Department of Corrections ("IDOC"), he did not attend his appointment with Dr. Kahn on March 4, 2024. *Id.*

On April 9, 2024, Plaintiff had x-rays taken at Jacksonville Correctional Center of his thoracic spine, lumbar spine, left knee, and right shoulder, all of which showed an "unremarkable examination" and no fractures. (Doc. 33-2 at ¶ 5; Doc. 33-3 at pp. 339-342).

### III

### A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and

draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

### B

Plaintiff alleges that Defendant was deliberately indifferent to the treatment of his injuries. Defendant argues she is entitled to summary judgment because Plaintiff received constitutionally adequate medical care. Because Plaintiff was a detainee and not convicted prisoner during the relevant time period, his claims are reviewed under the Fourteenth Amendment rather than the Eighth Amendment. *See Rice v. Kim*, EEB-20-3693, 2023 WL 8281571, at *3 (N.D. Ill. Nov. 30, 2023) (finding that in the case of a detainee rather than a prisoner, the Fourteenth Amendment's "objective reasonableness" standard applies, not the Eighth Amendment's "deliberate indifference" standard); *see Pittman by & through Hamilton v. Cnty. of Madison, Ill.*, 970 F.3d 823, 830 (7th Cir. 2020) (citing *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018) ("explaining that under *Miranda*,[2] 'a standard of objective reasonableness, and *not deliberate indifference*, governs claims under the Fourteenth Amendment's Due Process Clause.'") (emphasis in *Pittman*).

Under the Fourteenth Amendment, Defendant's conduct is assessed using the objective reasonableness standard. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022) (citing *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020)); *Miranda*

---

[2] *Miranda v. Cnty of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

*v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2019). To prove Defendant failed to provide reasonable medical care, Plaintiff must show Defendant acted purposefully, knowingly, or recklessly. *McCann*, 909 F.3d at 886 (quoting *Miranda*, 900 F.3d at 353). If Defendant was "aware that [her] actions would be harmful, then [she] acted purposefully or knowingly; if [she was] not necessarily aware but nevertheless strongly suspected that [her] actions would lead to harmful results, then [she] acted recklessly." *Pittman*, 970 F.3d at 828.

A court evaluating the reasonableness of medical care considers all the facts and circumstances faced by the individual alleged to have provided inadequate care and, without considering the subjective beliefs held by that individual, whether the response was reasonable. *Jump*, 42 F.4th at 793. In assessing the reasonableness of a response, relevant factors include (1) notice of the medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment (balanced against the seriousness of the need); and (4) police interests, including administrative, penological, and investigatory concerns. *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011) (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403-04 (7th Cir. 2007) (discussing the factors in a case involving medical care claims arising under either the Fourth or Fourteenth Amendments)); *Pulera*, 966 F.3d at 552 (citing *Williams*, 509 F.3d at 403).

1

Regarding his pain medication, Plaintiff alleged that (1) he did not receive any of his medications during the first thirty-six days of his detention; (2) Defendant refused to provide an alternative medication when he claimed Naproxen made him sick; (3) when he refused to sign a waiver, Defendant discontinued the prescription for Naproxen and provided no alternative; and (4) Defendant gave him a different medication than what Dr. Kahn prescribed on January 15, 2024. (Doc. 8).

11

Defendant argues Plaintiff's allegations are unsupported by the record and his deposition testimony. On September 20, 2023, Plaintiff's treating physician, Dr. Kahn, prescribed Naproxen for ten days; the prescription expired on September 30, 2023. Plaintiff did not attend his follow up appointment on October 4, 2023, and therefore did not receive further prescriptions. It is undisputed that Plaintiff was not prescribed any medications when he was booked at the VCJ on October 18, 2023. This was confirmed during his initial medical screening on October 20, 2023, when Plaintiff denied taking any medications.

The evidence shows that Defendant first learned of Plaintiff's complaints of pain on November 13, 2023 (26 days after booking). Defendant gave him an extra blanket to elevate his foot and offered to prescribe him pain medication, but Plaintiff refused the medication. Defendant called for him to be seen in the medical clinic on November 15, 2023, but he refused to be seen. On November 20, 2023, Plaintiff complained to Defendant about knee pain and requested pain medication; Defendant prescribed him Naproxen, the same medication Dr. Kahn previously prescribed (33 days after booking). Plaintiff's allegations that he was not prescribed pain medication until thirty-six days after booking is unsupported by the record.

Plaintiff also asserts Defendant was deliberately indifferent by not prescribing an alternative pain medication after he reported Naproxen made him feel ill. However, Plaintiff complained to Nurse Rush, not Defendant, that Naproxen made him ill. Nurse Rush advised him to take the medication with food. Plaintiff's medical administration record indicates that Plaintiff continued to take Naproxen in the evenings into January 2024, but regularly refused it in the morning. There is no evidence that Defendant was aware of any issues with the Naproxen prescription, especially because it was the same medication that Dr. Kahn previously prescribed. Plaintiff did not identify any issues with Naproxen

12

when Defendant prescribed it on November 20, 2023. Defendant was not deliberately indifferent by not prescribing an alternative pain reliever. While Plaintiff may have disagreed with the prescription provided, a mere disagreement with medical judgment does not rise to the level of a constitutional violation. *See McCann*, 909 F.3d at 886.

Plaintiff also alleges that his constitutional rights were violated because his pain medication was discontinued after he declined to sign a waiver/release acknowledging the long-term use of NSAIDs. On January 10, 2024, Nurse Rush asked Plaintiff to sign the waiver, but he refused. This caused his prescription for Naproxen to be discontinued. Plaintiff was referred to Nurse Practitioner Skimehorn to discuss pain management, but he refused to attend his appointment on January 12, 2024. On January 15, 2024, Dr. Kahn prescribed Plaintiff Tylenol extra strength, and Defendant provided this medication to Plaintiff as prescribed.

The Seventh Circuit has routinely "rejected claims where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (emphasis in original)). In *Brown v. Downey*, 805 F.3d 776 (7th Cir. 2015), the Seventh Circuit considered a claim by a detainee who requested narcotic medication to address his pain after surgery. There, the Court found that the decision to prescribe a non-narcotic pain medication was within the bounds of professional judgment. *Id.* at 785; *see also Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (noting that "[t]he administration of pain killers requires medical expertise and judgment" and that their use "entails risks that doctors must consider in light of the benefits").

Similarly, in *Thomas v. Clay*, the Seventh Circuit affirmed summary judgment in favor of Cook County Jail nurses on the plaintiff's claim that his pain medication for his shoulder injury was denied or delayed. 411 F. App'x 908, 909

(7th Cir. 2011). Evidence revealed that the plaintiff received medication consistently and that when he did not receive medication, there was no evidence that the lack of medication posed an excessive risk of harm.

Here, Plaintiff consistently received pain medication, and there is no dispute that he regularly took Naproxen. Plaintiff has not introduced any medical evidence that Defendant's treatment was objectively unreasonable. Plaintiff's medical records show that Defendant prescribed pain medication the same day he complained about pain. Defendant prescribed the same pain medication recommended by his orthopedic specialist, Dr. Kahn. She also followed Dr. Kahn's recommendation and provided Tylenol extra strength as prescribed. *See Johnson v. Snyder*, 444 F. 3d 579, 586 (7th Cir. 2006) (finding it proper for nurse to defer to a physician's diagnosis); *Donald v. Wexford Health Sources, Inc.*, 982 F. 3d 451, 462-63 (7th Cir. 2020) (holding that there is no authority for the proposition that a medical care provider who follows the advice of a specialist exhibits deliberate indifference). No reasonable jury would find that Defendant violated Plaintiff's constitutional rights with regard to his pain medication.

### 2

Regarding physical therapy, Plaintiff alleges (1) his physical therapy was delayed because Defendant scheduled appointments too far apart; (2) she only made appointments for his knee when he also needed physical therapy for his arm; and (3) he did not receive physical therapy until January 29, 2024. Defendant argues she referred Plaintiff to his orthopedic specialist and physical therapy, as Dr. Kahn recommended, and did not delay Plaintiff's therapy.

On November 27, 2023, Dr. Kahn ordered physical therapy for Plaintiff's knee; Plaintiff was transported to his first physical therapy appointment only nine days later on December 6, 2023. When Plaintiff saw the physical therapist again on January 15, 2024, his knee was steadily improving, he was not using the knee

brace, and new home exercises were provided. Plaintiff testified that he did the home exercises in his cell. *See Burton v. Downey*, 805 F. 3d 776, 787 (7th Cir. 2015) (holding that an inmate could not sustain a claim of deliberate indifference when medical personnel at the prison instructed the inmate how to perform therapy in his cell) ; *Kyles v. Williams*, 679 F. App'x 497, 499 (7th Cir. 2017) (defendants' decision to limit physical therapy to eight sessions does not reflect deliberate indifference given that physical therapist taught prisoner exercises that he could continue to perform in cell). Plaintiff also received ice packs to assist with the therapy. Plaintiff's claims that he did not receive timely physical therapy, or did not receive physical therapy before January 29, 2024, are contradicted by the record.

Plaintiff also argues he was denied physical therapy for his right shoulder. This claim is unsupported by the evidence. The undisputed material facts show that when Plaintiff entered VCJ in October 2023, his right shoulder was visibly healed, he did not complain about his right shoulder during his initial medical screening, and there were no known orders for physical therapy. Plaintiff was seen by the orthopedist, Dr. Kahn, on November 27, 2023, and again on January 15, 2024. Dr. Kahn did not order physical therapy for his arm. Plaintiff's disagreement with Dr. Kahn's medical judgment is not a constitutional violation. *Snipes*, 95 F.3d at 592 ("[T]he Constitution is not a medical code that mandates specific medical treatment").

Moreover, when Plaintiff complained about his shoulder on January 12, 2024, Defendant called and spoke to Carle Hospital on January 17, 2024, about who Plaintiff should see. Dr. Kahn agreed to see Plaintiff at the next available appointment on March 4, 2024. Plaintiff was transferred to the IDOC on March 1, 2024, and did not attend his appointment with Dr. Kahn on March 4, 2024. There is no indication that Defendant had any control over Plaintiff's transfer or was

responsible for him missing his appointment. Finally, Plaintiff has not presented any medical evidence that any delay in physical therapy harmed his shoulder. *See Kyles v. Krizan*, 771 F. App'x 676, 676-77 (7th Cir. 2019).

During his five-month detention at VCJ, Plaintiff was seen by medical staff multiple times, received two appointments with the orthopedic surgeon, and two additional appointments with the physical therapist, was given timely and adequate pain medication, space to perform home exercises, an extra blanket to elevate his foot, and ice packs. No reasonable jury would find that the care he received was constitutionally inadequate. Therefore, the Court finds that Defendant is entitled to summary judgment.

### 3

Alternatively, Defendant argues that she is entitled to qualified immunity. (Doc. 33 at pp. 19-20). Having found that Defendant did not violate Plaintiff's Fourteenth Amendment rights, the Court need not address whether she is entitled to qualified immunity. *See Johns v. Tinsley*, No. 16-1106-JES, 2018 WL 10811472, at *5 (C.D. Ill. Mar. 7, 2018) (citing *Van den Bosch v. Raemisch*, 658 F.3d 778, 787 n. 9 (7th Cir. 2011)).

### IV

For the reasons stated, *supra*:

(1)   Defendant's Motion for Summary Judgment [33] is GRANTED. Plaintiff's Motion for Summary Judgment [46] is DENIED. Defendant Shelly Harding is DISMISSED WITH PREJUDICE. Plaintiff takes nothing. Each side is to bear their own attorney's fees, costs, and expenses.

(2)   The Clerk is directed to enter judgment and close this case.

(3)   Although this case has been dismissed, Plaintiff remains responsible for paying the remainder of the $350 filing fee. (d/e 1/12/2024).

(4) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

(5) To proceed *in forma pauperis* on appeal, Plaintiff must file a motion to proceed on appeal *in forma pauperis* and identify the issues he will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal.

*It is so ordered.*

Entered: August 15, 2025

s/Jonathan E. Hawley
U.S. District Judge